The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Cramer and the briefs before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. The only issue presented on appeal is whether the contract for legal services between plaintiff and her counsel is reasonable. The Full Commission agrees with the Deputy Commissioner's determination that the subject contract is unreasonable and affirms the award of a reasonable attorney's fee in the amount of twenty-five percent of plaintiff's compensation.
* * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. On or about 11 January 1994, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On or about 11 January 1994, the employer-employee relationship existed and had existed since 2 June 1970, between defendant-employer and plaintiff-employee.
3. Aetna was the workers' compensation insurance carrier on the risk.
4. On or about said date the plaintiff contends that she sustained an injury by accident arising out of and in the course and scope of her employment when she attempted to remove a disc stuck on a press. The defendant contends that she was not injured while attempting to remove the stuck disc.
5. Plaintiff's average weekly wage as of 11 January 1994 was $488.88, and the weekly compensation rate would be $325.92, according to the Form 22 dated 12 October 1995.
6. Plaintiff missed the following time from work as a result of said injury as shown of the 1994 Individual Absence Record, which is stipulated into evidence, and will be entitled to workers' compensation temporary total disability benefits for that period of time, if the case is compensable: 17 February to 14 August 1994.
7. Plaintiff returned to work on or about 15 August 1994 at the same or greater wages.
8. Plaintiff received weekly disability checks from 17 February 1994 through 14 August 1994 as a result of her right arm and shoulder injury, from a disability policy she purchased. The defendants are not seeking an offset against workers' compensation benefits for said disability payments.
* * * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. Plaintiff is a female who was born on 1 January 1942. She completed the tenth grade.
2. Plaintiff had worked in several different positions since she began her employment with defendant in 1970. She had worked as a packer, packing balls and plastic bottles, and as a stockman, where she drove a forklift-type clamp truck. For eight years, she had worked as a press operator, making six pack carriers. The press has five metal reels on each side. Each reel weighs about 35 pounds. A metal disc goes on each side of the reel. Plaintiff would load the discs and reels onto the machine to start the operation and then unload them when the reel was full.
3. On 11 January 1994, plaintiff was working the second shift. Around 3:00 p.m. that afternoon, she had difficulty trying to remove one of the discs which was stuck. She pulled harder than usual, using both arms and tried pushing and pulling on the disc, eight or nine times, in an effort to get it off, but without success. She finally asked for assistance from a supervisor, Frank Tindall, who was able to get it off by pulling on it. The disc was stuck and he had some difficulty getting it off.
4. Although the discs sometimes stick, plaintiff had not needed to ask a supervisor for assistance before to get a disc off. The stuck disc, and the extra effort plaintiff used in an effort to remove the disc was an unusual event, which interrupted plaintiff's normal work routine, and an accident arising out of plaintiff's employment.
5. As of 11 January 1994, plaintiff was taking Motrin due to a prior back injury. She did not notice any pain that day, but the next day had pain and discomfort in her right upper extremity, primarily in her arm. Throughout the day, the pain continued and increased, so she took Motrin three times rather than twice that day.
6. Plaintiff's right upper extremity pain continued throughout the next few weeks, and increased such that it began waking her up at night. She complained constantly about her pain to co-worker, Isabell Washington, to the point the point that Ms. Washington got tired of hearing about it. Plaintiff had not experienced any prior problems or pain in her right upper extremity and had never before complained to Isabell Washington about such pain.
7. Plaintiff's pain increased to the point she felt she could no longer "stand it" and on or about 16 February 1994, she told her supervisor, Frank Tindall, and he told her to go to the doctor. Plaintiff had not mentioned it before, because she kept thinking that the pain would get better. The fact that it was about a month after the incident, before plaintiff mentioned her pain to Frank Tindall did not cause any prejudice to the employer. Frank Tindall was present on 11 January 1994 and was the person who actually got the disc unstuck, so that the employer had actual notice of the incident at the time it occurred.
8. Plaintiff was seen on 17 February 1994 by Dr. Rosamuel Dawkins, Jr., at which time she complained of pain in her right arm and shoulder. He assessed a muscle strain and prescribed Robaxisal, a muscle relaxant, and Tylenol. When her complaints continued on her next visit on 21 February 1994, Dr. Dawkins referred plaintiff to Dr. Boatright, an orthopaedic specialist, for evaluation.
9. Dr. Boatright first saw plaintiff on 25 February 1994, when she complained of pain in her shoulder, biceps and upper forearm. She indicated she had tingling in the index, long and ring fingers for the last five days. Plaintiff also related that she was frequently awakened with pain when she turned over. Dr. Boatright conducted a physical examination, and x-rays, which were normal. Plaintiff had full range of motion, although plaintiff grimaced on motion of the right shoulder. Dr. Boatright suspected rotator cuff tendinitis of the shoulder and mild tendinitis of the elbow. He did not find any evidence of carpal tunnel syndrome at that time.
10. Dr. Boatright sent plaintiff for physical therapy and released her to return to light duty, but since the employer had none available at that time, plaintiff was unable to return to work.
11. Dr. Boatright continued to see plaintiff for her upper extremity problems through September, 1994. Over the next few months, plaintiff's symptoms waxed and waned, though overall she seemed to improve. Dr. Boatright treated her with injections of Zylocaine and Celestone, which gave her temporary symptom relief.
12. On her visit of 21 April 1994, Dr. Boatright found a positive Tinel's and positive Phalen test, indicating possible median nerve compression. Nerve conduction studies were done on 28 April 1994, and showed very mildly elevated conduction delays, indicating possible mild carpal tunnel syndrome. Dr. Boatright did not believe plaintiff was a candidate for a surgical carpal tunnel release at that time.
13. Dr. Boatright referred plaintiff to Dr. Naso for a second opinion as to plaintiff's carpal tunnel symptoms and possible surgery. Plaintiff saw Dr. Naso on 2 June 1994. Dr. Naso agreed with Dr. Boatright's assessment that plaintiff may have mild carpal tunnel syndrome based upon the nerve conduction studies. He also agreed that a surgical release was not needed at that time.
14. Plaintiff's symptoms related to carpal tunnel problems did not develop at the time or shortly after her accident. It was more than a month after her accident before she started developing carpal tunnel symptoms. As noted by Dr. Boatright, the trauma sustained in the pushing and pulling plaintiff would have exerted in trying to remove the disc is not the type of trauma that would tend to compress the median nerve. The evidence fails to show that any carpal tunnel syndrome plaintiff may have developed, as opposed to other upper extremity problems, was caused by her accident of 11 January 1994. There is no evidence that plaintiff's employment placed her at an increased risk of developing carpal tunnel syndrome, such that it could be considered an occupational disease.
15. Over the course of the summer of 1994, Dr. Boatright continued to treat plaintiff, and she continued to improve. He released her to return to her usual work activities on 15 August 1994. As of 27 September 1994, when he last saw plaintiff in 1994 for her upper extremity complaints, Dr. Boatright's diagnosis was still right rotator cuff tendinitis and EDC, tendinitis.
16. Plaintiff continued to experience pain in her right upper extremity, and, at the advice of her counsel, returned to see Dr. Boatright regarding these complaints on 17 August 1995. She complained of dull pain in her upper extremity, made worse by activity. She also complained of numbness in her arm, and finger numbness that would come and go. Dr. Boatright found mild to moderate tenderness over the anterior aspect of the right shoulder and only slight limitation of motion of the right shoulder, which was still within normal limits. Plaintiff had full range of motion of her right wrist and elbow. The Tinel's sign was negative, and Phalen and compression signs were weakly positive.
17. Dr. Boatright ordered an arthrogram to do a more complete assessment. The arthrogram showed some degree of abnormality of plaintiff's rotator cuff. Dr. Boatright then sent her to Dr. D'Alessandro for a second opinion. Dr. D'Alessandro is a colleague of his at the Miller Orthopaedic Clinic, whose specialty is sports medicine and shoulder surgery.
18. Dr. D'Alessandro examined plaintiff on 13 September 1995. An MRI was done on 26 September 1995. After reviewing the MRI results, Dr. D'Alessandro has assessed plaintiff's condition as moderate AC arthrosis with minor impingement of the supraspinatus outlet, consistent with bursitis, with no significant rotator cuff tear. Dr. D'Alessandro recommends an arthroscopic acromioplasty and distal clavicle resection. He does not anticipate that this procedure would reveal a significant cuff tear, but believes it might give plaintiff some relief.
19. Plaintiff's injury by accident of 11 January 1994 caused injury to her upper right extremity, causing pain in her shoulder and arm. Although the exact nature of the injury has not been determined, it appears she has rotator cuff tendinitis, bursitis and/or a possible small rotator cuff tear. As of the hearing date, plaintiff continued to experience pain in her right arm and shoulder.
20. The evidence fails to establish that plaintiff's complaints of pain and occasional numbness in her right hand, possible carpal tunnel syndrome, is causally related to her injury by accident of 11 January 1994.
21. Plaintiff has not yet reached maximum medical improvement and additional medical treatment is reasonably necessary to further treat plaintiff's right upper extremity, including possible arthroscopic surgery, to give plaintiff pain relief.
22. As a result of her injury by accident, and the resulting pain in her right upper extremity, plaintiff was unable to engage in her regular employment and to earn wages with defendant from 17 February 1994 through 14 August 1994. Defendants did not offer plaintiff any light duty during this time and there is no evidence plaintiff was able to earn wages in any other employment.
23. Plaintiff's counsel submitted as Plaintiff's Exhibit 3 a copy of his contingent fee contract with plaintiff, which calls for a contingency fee of "33 1/3% of any recovery or settlement; and 50% if any further legal services are required after the trial, such as an appeal or retrial." While plaintiff's counsel has rendered valuable legal services which resulted in a decision in her favor (with the exception of the relationship of her CTS to her injury by accident), those services were not unusual or extraordinary. A twenty-five percent contingency fee is routinely considered to be customary and reasonable for counsel who represent plaintiffs appearing before the Commission. The Full Commission may approve a fee in excess of twenty-five percent in cases which present unusual circumstances or degree of difficulty. However, an attorney's fee of fifty percent is unlikely to be considered reasonable by the Commission under any circumstances.
* * * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. On 11 January 1994, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant when, by using extra effort to push and pull on a stuck disc on the press she was operating, she sustained injury to her right upper extremity. N.C. Gen. Stat. § 97-2(6).
2. Defendants are responsible for medical expenses incurred or to be incurred by plaintiff as a result of her injury by accident, for treatment rendered which was, or which may in the future be reasonably necessary to effect a cure, give relief, or lessen any period of disability, including potential arthroscopic surgery to her right shoulder. N.C. Gen. Stat. §§ 97-2(19),97-25.
3. As a result of her injury by accident, plaintiff was temporarily totally disabled from 17 February 1994 through 14 August 1994, and is entitled to compensation at the rate of $325.92 per week during this period, such benefits having now accrued, to be paid in a lump sum, subject to attorneys fees. N.C. Gen. Stat. § 97-29.
4. A reasonable attorney's fee is twenty-five percent of the compensation accrued and due plaintiff, based upon fees customarily charged by plaintiff's counsel appearing in workers' compensation cases before the Commission. N.C. Gen. Stat. §97-90.
* * * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of her injury by accident of 11 January 1994 for treatment rendered which was or which may in the future be reasonably necessary to effect a cure, give relief or lessen any period of disability.
2. Defendants shall pay plaintiff compensation at the rate of $325.92 per week from 17 February 1994 through 14 August 1994 as temporary total disability compensation.
3. A reasonable attorney's fee of twenty-five percent of the compensation accrued and due plaintiff is approved for plaintiff's counsel, to be deducted from the compensation due plaintiff and paid directly to her attorney.
4. Defendants shall pay the costs.
This the 25th day of June 1997
 S/ _____________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/ _____________ BERNADINE S. BALLANCE COMMISSIONER
S/ _____________ J. HOWARD BUNN, JR. CHAIRMAN
LKM:jmf